MARC J. FAGEL (Cal Bar No. 154425)
SUSAN F. LAMARCA (Cal Bar No. 215231)
  lamarcas@sec.gov
PATRICK T. MURPHY (Admitted in N.Y.)
  murphyp@sec.gov
ROBERT S. LEACH (Cal Bar No. 196191)
  leachr@sec.gov
SUSAN FLEISCHMANN (Cal Bar No. 207194)
  fleischmanns@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:   (415) 705-2501

ORIGINAL FILED
AUG 1 7 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

vs.

MICHAEL J. BYRD,

    Defendant.

Civil Action No.

C 07 4223  WHA

COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1.  From at least 2000 through 2004, Brocade Communications Systems, Inc. ("Brocade" or "the Company"), a San Jose computer storage networking company, concealed millions of dollars in expenses from investors and significantly overstated its income by falsifying records relating to employee stock option grants. The fraudulent scheme was executed by former chief executive officer Gregory L. Reyes ("Reyes"), who routinely backdated stock option grants to give Brocade employees and recruits valuable "in-the-money" stock options without disclosing the practice or recognizing the

COMPLAINT

required compensation expense on the Company's financial statements. To carry out this scheme, for certain highly sought after recruits, Reyes and others falsified paperwork related to the grants to make it look as if the employees had been hired and employed by Brocade long before the time they actually started with the Company, so that those employees could receive options that were backdated to a date in the past when Brocade's stock price was significantly lower.

2. Michael J. Byrd ("Byrd") was hired by Reyes in May 1999 as chief financial officer ("CFO"), just as the Company went public. As CFO, Byrd had responsibility for preparing and reviewing Brocade's annual and quarterly financial statements, which described the Company's accounting for stock options. In May 2001, Byrd was promoted to chief operating officer ("COO") and president, positions he maintained until he left Brocade in 2003. On multiple occasions, Byrd learned that Reyes was claiming to have granted options to newly-hired executives, whom Byrd understood were not actually employed by Brocade on the purported grant date. This resulted in the issuance of in-the-money options to the executives, which were not properly accounted for in Brocade's financial statements or disclosed to its shareholders. Byrd was also alerted to other facts suggesting that the CEO was manipulating options grants.

3. Although alerted to these facts, Byrd allowed Brocade to represent to shareholders that the Company did not incur expenses for stock options issued to employees, including executives. As a result, Reyes' stock option manipulation continued unabated and Brocade reported materially understated expenses, overstated its income, and falsely represented in certain Commission filings that the Company had incurred no costs for options grants.

4. By engaging in the acts alleged in this Complaint, Byrd violated the antifraud, books and records and other provisions of the federal securities laws. The Commission seeks an order enjoining Byrd from future violations of the securities laws, requiring him to disgorge ill-gotten gains with prejudgment interest and to pay civil monetary penalties, and providing other appropriate relief.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and

78aa. The defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this complaint.

6. This district is an appropriate venue for this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Northern District of California, and the defendant may be found in this district.

## INTRADISTRICT ASSIGNMENT

7. Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rule 3-2(e) because the related litigation, *SEC v. Reyes, et al.* Civil Action No. C-06-4435 CRB (N.D. Cal.), is pending in that division.

## DEFENDANT

8. Michael J. Byrd, 45, of Saratoga, California, was Brocade's CFO and Finance Vice President from May 1999 until May 7, 2001, when the Company's board of directors promoted him to COO and president. He retired from Brocade in January 2003. Before joining Brocade, he was CFO of another public company, Maxim Integrated Products, Inc. From 1982 to 1994, he held various positions, including partner, at Ernst & Young. He is a licensed CPA in California on inactive status.

## RELEVANT ENTITY

9. Brocade is a Delaware corporation based in San Jose, California, that develops and sells storage networking products. Since May 1999 when it completed its initial public offering of stock, Brocade's securities have been traded on the Nasdaq National Market, and the Company has had common stock registered with the Commission under Section 12(g) of the Exchange Act. At all times relevant to this action, Brocade used a fiscal year ending on the last Saturday in October. In May 1999 when the Company went public, Gregory L. Reyes was Brocade's CEO and a member of its board of directors, and beginning in May 2001, Reyes became chairman of Brocade's board of directors. Reyes maintained those positions until resigning them in January 2005. Reyes continued as a director until April 22, 2005, and was described by the Company as an advisor until July 2005.

## FACTUAL ALLEGATIONS

### The Backdating Scheme

10. Brocade became a public company in May 1999 and quickly experienced substantial growth in revenue and in the size of its operations. Between October 1999 and October 2002, Brocade increased the size of its workforce more than six-fold, hiring over 1,150 employees.

11. To recruit and retain key employees, Brocade made liberal use of employee stock options as a form of compensation. The stock options gave employees the right to buy Brocade's stock at a set price, called the exercise price or "strike" price. The value of the options to the employees increased to the extent that the market price of Brocade's stock exceeded the strike price of the options.

12. Under the accounting rules in effect from the time Brocade became a public company in 1999 through 2004, U.S. public companies were permitted to grant stock options to employees without recording an expense in their financial statements so long as the strike price of the option was at or above the market's closing price for the stock on the day the options were granted. However, for any options granted "in-the-money" – that is, with a strike price below the market price when granted – public companies were required to record a compensation expense in their financial statements. Consequently, granting in-the-money options to employees could have a significant impact on the expenses and income (or loss) reported to the shareholders of a public company.

13. As a public company, Brocade filed with the Commission annual reports that included audited financial statements, certified by the Company's outside auditors. Brocade's public filings affirmatively stated that the Company accounted for its stock options granted to employees in accordance with generally accepted accounting principles, also known as GAAP, which are the accounting conventions, standards, and rules required for preparing financial statements. Brocade further represented that it followed a provision under GAAP requiring an expense to be recorded for stock options granted at prices below the market value for the stock on the date of the grant.

14. Brocade made the statements about accounting for stock options in accordance with GAAP in the notes to its audited financial statements, included in its annual reports to shareholders

filed with the Commission on Form 10-K, including those for its fiscal years 2000, 2001 and 2002. Brocade's annual reports on Form 10-K for its fiscal years 2000, 2001, and 2002 represented that, with the exception of certain pre-IPO options granted in 1999, "[n]o deferred stock compensation related to any other periods had been recorded."

15.     In contravention of Brocade's disclosed practice, CEO Reyes and others systematically created false and misleading "minutes" of purported "meetings," or similar documentation, that represented that options had been granted to employees and executives on particular dates and used the closing price of Brocade's stock on those dates as the options exercise price, although the options had actually be granted and the paperwork prepared days, weeks, or months afterward, when the market price for Brocade's stock was higher. The employees and executives were thereby provided extra, undisclosed compensation in the form of in-the-money options, while Brocade failed to record the necessary expense for the extra compensation.

16.     During Byrd's tenure at Brocade, the backdating scheme resulted in materially misstated quarterly and annual financial statements and required reports, which Brocade restated in 2005. For example, after restating its financial results, net income for fiscal years 1999 through 2001 declined by a total of $303 million. Brocade's false and misleading periodic reports were also incorporated by reference into registration statements filed by Brocade with the Commission on Form S-8.

**Byrd Learns of Manipulated Options Grants to Executives**

17.     Byrd joined Brocade as CFO in May 1999 and, until late 1999, assisted Reyes in making stock option grants to employees. After 1999, Byrd was at times consulted about potential grants, but was not routinely involved in the preparation or review of options grant lists.

18.     On October 22, 1999, Reyes emailed Byrd and others stating that Reyes had awarded options to a vice president on a date several months earlier when Brocade's stock price was trading at a much lower price, but the grant had "fallen through the cracks." Reyes directed that the individual be "added retroactively" to a list of grantees to be reviewed with Brocade's board. While others responded to Reyes' directive, Byrd learned through subsequent emails that the number of options to be retroactively granted to the employee had not yet been established. Although Byrd understood that GAAP required that the number of options be determined at the time of the grant in order to avoid a

compensation expense, Byrd permitted the after-the-fact determination of the number of options to go forward, without ensuring that Brocade recorded the necessary expense.

19. Ultimately, after Reyes settled on an option grant of 20,000 shares to the employee, Byrd sought assurance from Reyes that Reyes, in fact, had determined to grant the option several months earlier as he had claimed. In an October 24, 1999 email, Byrd wrote: "Greg [Reyes] needs to give us a note," providing written assurance that the grant had actually been made by Reyes on the date indicated in the grant paperwork. However, Byrd did not take steps to determine whether Reyes had actually determined on the date assigned to the grant the number of options to be granted to the employee, nor did he check to see that Reyes had provided a "note" in the vice president's file that said he had done so. Brocade did not record an expense in its financial statements for this in-the-money grant.

20. In October 1999, in response to an accounting interpretation then being proposed, Byrd emailed Reyes suggesting that to provide well-timed options grants to individuals before they started working full time for Brocade, the Company should hire the employees on a part time basis and "pay them for four hours a week until they start." Byrd understood the proposed accounting interpretation regarded the definition of an "employee," which was important because the granting of options to non-employees would require a public company to record an expense. Byrd added that he viewed his suggestion to Reyes as a "silly solution but it is the only one I can think of."

21. Brocade thus instituted a so-called "part-time" program, which became the subject of abuse and a means for granting options to individuals who were not employees on the date stock options were purportedly granted to them. Byrd became aware of facts suggesting that Reyes and others were misusing the part-time program.

22. On June 27, 2000, Reyes and Byrd received an email forwarding a June 23, 2000 request from a Brocade recruiting manager seeking authority to make an offer of employment, including a proposed option grant, to an individual then interviewing at Brocade for a vice president position. The email indicated that as of June 23, 2000, the VP candidate had not yet been given an offer and was employed full-time at another company. Although on June 23, 2000 Brocade's stock closed at approximately $156 per share, the manager recommended that the VP recruit be offered options with

COMPLAINT                                    6

a strike price of "$135 or less." The June 27, 2000 email (sent when Brocade's price was trading at $160 per share), stated: "Greg [Reyes] and Mike [Byrd] will need to approve offer date (i.e. 6/14 @[$]138.141 or 6/12 @[$]134.313)."

23. The candidate received an offer letter dated June 12, 2000, two weeks prior to the email exchange discussing his potential hiring, which indicated he would be granted 125,000 options, and described a supposed part-time start date of June 12, 2000. The candidate, along with many other Brocade employees, was ultimately granted options in a grant that was dated June 12, 2000 and which described the strike price as the supposed "fair market value" of $134.31, the closing price of Brocade's stock on June 12, 2000. Brocade did not record an expense for this in-the-money grant, and Byrd did not notify the Company's auditors that the candidate was neither a part-time nor a full-time employee on June 12, 2000.

24. Again, on August 7, 2000, a Brocade VP emailed Reyes, Byrd and others, informing them that he had identified an ideal candidate for director of software at Brocade. However, the email indicated that a lucrative package would be required to lure the candidate away from another company where he was then employed full-time. The VP sought authority from Reyes to offer options for "130,000 shares-150,000 shares at [$]160." On August 7, 2000, Brocade's stock was trading in the $199-$214 range, and the email made clear that the requested strike price of $160 would create a "current value of $5.2 [million] at 200 [dollars per share]."

25. Reyes responded by emailing Byrd and others, stating: "The great news is that I approved his stock some time ago when he agreed to become a part time employee. The gain that he has should be compelling." Notwithstanding the inconsistency of Reyes' purported "approval" of a grant before the candidate had even been offered or accepted the position, Byrd sent an email to another person working closely with Reyes in preparing the options grants, merely stating: "Please make sure that we made [the candidate] a part time employee when his stock option was granted and all of the documentation is in agreement with this fact." Brocade did not record an expense for this in-the-money grant.

26. In September 2001, after Byrd had become Brocade's COO, Byrd began recruiting Richard Geruson for a position as Brocade's chief marketing officer. Byrd's efforts were

unsuccessful; Geruson turned down the position in November 2001, and it was offered to someone else. However, in late December 2001, Geruson began interviewing with Byrd for a different position, as Brocade's vice president of customer care. Sometime in mid-January, Byrd verbally offered the position to Geruson, who accepted this position on January 23, 2002. On February 13, 2002, Byrd sent an email to all Brocade employees announcing Geruson's arrival and welcoming him to Brocade.

27. Despite the fact that Geruson did not accept employment with Brocade until January 2002, around February 6, 2002, Reyes signed minutes of a purported Committee meeting on October 30, 2001 indicating that Geruson's hire date was October 30, 2001 and that Reyes awarded options to Geruson (and many others) on October 30, 2001 with a $24.20 exercise price, which was the closing price of Brocade's stock on that date. Brocade did not record an expense for this in-the-money grant.

28. On February 11, 2002, shortly before Geruson actually started working at Brocade, Byrd received emails from an employee in Brocade's human resources department stating that Geruson had requested that his official full-time start date be changed to February 13, 2002. Byrd responded by stating, "[w]e need to make sure that the record reflects that this is his full time start date vs. his earlier part-time start date." The employee emailed Byrd back that the "part-time" start date had been designated October 30, 2001, to which Byrd responded by thanking the employee. As Byrd was aware, Geruson did not begin work at Brocade – part-time or otherwise – until February 2002. Byrd also did not reveal this discrepancy to the Company's external auditors.

29. On January 31, 2002, Byrd interviewed Daniel Cudgma for a position as a Brocade sales director. Byrd knew that Reyes would also interview Cudgma for the position. On the morning of February 1, 2002, Reyes met with Cudgma and, later that day, Reyes sent an email to Byrd and others, stating "I love Dan [Cudgma]." Reyes suggested that Cudgma be hired and directed that Cudgma be given "the Q1 option $2x.xx option price," referring to Brocade's closing stock price on November 28, 2001 ($28.82), one of the low closing prices in Brocade's first fiscal quarter. On February 1, 2002, Brocade's stock was trading around $37 per share, and had not traded below $30 per share since November 28, 2001.

30. As Byrd was aware, Brocade's first quarter had ended on January 26, 2002, several days before Byrd received Reyes' email about Cudgma's options grant. Reyes later signed purported "minutes" of a supposed Committee meeting on November 28, 2001, awarding options to Cudgma (and many others) with the $28.82 strike price, and which also described Cudgma's hire date as November 28, 2001. Brocade did not record any expense for this in-the-money grant.

31. Byrd himself also received backdated options. Based upon the recommendation of Reyes, Brocade granted to Byrd options to purchase 800,000 shares of Brocade stock, with an exercise price of $20.70, purportedly on April 17, 2001. However, these options were not actually granted until sometime in May 2001, and were then backdated to April 17, 2001. Byrd received an email in May 2001 indicating that the number of options he would be granted was still undecided. On or around June 15, 2001, Byrd was sent notification of the grant of 800,000 options clearly stating that the grant was effective April 17, 2001 with a strike price of $20.70 per share. By mid-June 2001, Brocade's stock was trading around $40 per share, nearly $20 per share above the exercise price for each of Byrd's options.

32. However, Byrd filed an annual statement with the Commission on Form 5 in December 2001, which falsely stated that the options were granted on April 17, 2001, at a price of $20.70. In addition, in financial statements included in periodic reports filed with the Commission (on Forms 10-Q and 10-K), and in a proxy statement filed with the Commission on February 25, 2002, Brocade represented that no expense had been incurred in connection with this grant and that Byrd's options were not in-the-money when granted.

**Byrd Permitted Brocade to Issue Materially False Financial Statements**

33. Brocade filed annual reports on Forms 10-K for fiscal years 2000, 2001, and 2002, and quarterly reports filed on Form 10-Q for the fiscal quarter ended April 28, 2001 through the fiscal quarter ended January 25, 2003, which materially misrepresented Brocade's stock-based compensation expense and net income and loss, and made materially false and misleading disclosures and omitted material information about Brocade's stock option practices. Byrd, as Brocade's CFO until May 2001, reviewed the financial statements and made representations to Brocade's outside

auditors about their accuracy. Also, as Brocade's president and COO from May 2001 until he left Brocade in January 2003, Byrd had continuing responsibility for the accuracy of those reports.

34. Between 2000 and 2003, Brocade also filed several registration statements with the Commission recording its offer of stock to employees, including statements dated August 13, 1999, January 28, 2000, June 13, 2000, and January 16, 2001, all of which Byrd reviewed and signed. Those registration statements incorporated Brocade's materially misleading periodic reports.

35. Byrd knew, or was reckless in not knowing, that Brocade's CEO and others were purporting to grant options to executives on dates that were significantly earlier than the persons actually became employed by Brocade, in order to provide those executives with in-the-money options. Byrd further knew, or was reckless in not knowing, that Brocade failed to record the required compensation expense for granting in-the-money options, or options to non-employees. Byrd therefore knew, or was reckless in not knowing, that Brocade's financial statements and the company's disclosures to shareholders were rendered materially false and misleading.

36. During the period from 2000 through 2001, Byrd was unjustly enriched by Brocade's stock option manipulation and the failure to properly record expenses at Brocade. Among other things, Byrd received bonuses or stock options, and exercised stock options, and sold shares of Brocade stock.

### FIRST CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

37. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

38. By engaging in the conduct described above, Defendant, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    (1) with scienter, employed devices, schemes or artifices to defraud;

    (2) obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and

(3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

39. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

40. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

41. By engaging in the conduct described above, Defendant, with scienter, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of facilities of a national securities exchange:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

42. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

*Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder*

43. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

44. By engaging in the conduct described above, Defendant knowingly falsified books, records, or accounts of Brocade, or knowingly circumvented or failed to implement a system of internal accounting controls.

45. By engaging in the conduct described above, Defendant, directly or indirectly, falsified or caused to be falsified, books, records, or accounts subject to 15 U.S.C. § 78m(b)(2)(A).

46. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## FOURTH CLAIM FOR RELIEF

*Violations of Exchange Act Rule 13b2-2*

47. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

48. Defendant, as an officer of an issuer, by engaging in the conduct described above, directly or indirectly, in connection with (a) an audit, review or examination of the financial statements of the issuer required to be made pursuant to Commission rules, or (b) the preparation or filing of any document or report required to be filed with the Commission pursuant to Commission rules: (1) made or caused to be made a materially false or misleading statement to an accountant, or (2) omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to an accountant.

49. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.

## FIFTH CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 13(a) of the Exchange Act*

*and Rules 12b-20, 13a-1 and 13a-13 Thereunder*

50. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

51. Based on the conduct alleged above, Brocade violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13, which obligate issuers of securities registered pursuant to the Exchange Act to file with the Commission annual and quarterly reports that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

52. By engaging in the conduct described above, Defendant knowingly provided substantial assistance to Brocade's filing of materially false and misleading reports and filings with the Commission.

53. By reason of the foregoing, Defendant has aided and abetted Brocade's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

### SIXTH CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act*

54. The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

55. Based on the conduct alleged above, Brocade violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. §78m(b)(2)(A), which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

56. By engaging in the conduct described above, Defendant knowingly provided substantial assistance to Brocade's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Brocade.

57.    By reason of the foregoing, Defendant has aided and abetted Brocade's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

### SEVENTH CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act*

58.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

59.    Based on the conduct alleged above, Brocade violated Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §78m(b)(2)(B), which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, to devise and maintain a sufficient system of internal accounting controls.

60.    By engaging in the conduct described above, Defendant knowingly provided substantial assistance to Brocade's failure to devise and maintain a sufficient system of internal accounting controls.

61.    By reason of the foregoing, Defendant has aided and abetted Brocade's violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

### EIGHTH CLAIM FOR RELIEF

*Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder*

62.    The Commission realleges and incorporates by reference Paragraphs 1 through 36 above.

63.    Based on the conduct alleged above, by filing inaccurate statements with the Commission regarding his change in ownership of Brocade shares during fiscal year 2001, Defendant violated Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), which obligates officers and directors of issuers registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, to file with the Commission statements regarding ownership of securities of the issuer.

64. By reason of the foregoing, Defendant has violated, and unless restrained and enjoined will continue to violate Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Exchange Act Rule 16a-3, 17 C.F.R. § 240.16a-3.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue an order permanently restraining and enjoining Defendant and his agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2, 17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), and Rules 12b-20, 13a-1 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

II.

Issue an order directing Defendant to disgorge all wrongfully obtained benefits, plus prejudgment interest.

III.

Issue an order directing Defendant to pay civil monetary penalties under Section 20(d) of the Securities Act, 15 U.S.C. §§ 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3).

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

V.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 17, 2007

Respectfully submitted,

*[signature]*

Susan Fleischmann
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION